IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| ALVIN L. SUTHERLIN, JR., ) | |
| ) | |
| Plaintiff, ) | Case No. 4:15-cv-00037 |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| LIEUTENANT J.W. SMITH, SERGEANT ) | By: Hon. Jackson L. Kiser |
| H.S. RICHARDSON, OFFICER N.M. ) | Senior United States District Judge |
| SLOVER, OFFICER M.C. PACE, ) | |
| OFFICER R.C. LANDRUM, OFFICER ) | |
| D.C. LANCASTER, OFFICER W.C. ) | |
| SHIVELY, OFFICER W.R. MERRILL, ) | |
| OFFICER J.D. DIXON, and OFFICER L.D. ) | |
| LAND, ) | |
| ) | |
| Defendants. ) | |

This matter is before the Court following a bench trial on the merits of Alvin Sutherlin's ("Plaintiff") 42 U.S.C. § 1983 action on alleged violations of his rights under the Fourth and Fourteenth Amendments. The case was tried on July 11, 2016, after which the parties briefed their legal conclusions. This Memorandum Opinion represents my findings of fact and conclusions of law. See Fed. R. Civ. P. 52(a). For the reasons stated herein, Plaintiff has not proven his claims[1] by a preponderance of the evidence.[2]

---

[1] It is worth recalling some basics: a complaint states a case, pleadings shape the issues for trial, and trial evidence proves (or fails to prove) the elements of a claim in issue. On Defendants' Motion to Dismiss Plaintiff's Complaint, my Memorandum Opinion expressed an understanding that the following claims remained:

 1. the officers' entry into Plaintiff's residence without knocking or announcing their presence;
 2. improper service of the search warrant;
 3. the search of Plaintiff's pockets and the seizure of cash and cell phones;
 4. the seizure of ammunition, dies, and a gun; and
 5. the inventory of DVDs before the second warrant was obtained.

- 1 -

I.  **FINDINGS OF FACT**[3]

On September 25, 2013, Plaintiff lived at 505 Jefferson Street, a building operated as a rooming house, ("the Rooming House") in Danville. In addition, Plaintiff was the landlord. Each room, whether on the first or second floor, had a number above the door. Plaintiff's room was numbered "2," and his office ("Room 1") was numbered, "1." On the second floor were four rental units, occupied by tenants. On the first floor were a kitchen, an inoperable half bathroom, and the rooms occupied by Plaintiff and his sons.

The Rooming House's front door opened into the common area (or hallway), through which any of the Rooming House's entrants (tenants, Plaintiff, his sons, and presumably visitors) would pass to reach their destination. The stairs to the second floor were toward the back of the common area, before reaching the kitchen or the half bathroom. Room 1 was situated next to the common area. The tenants, Plaintiff, and his sons shared the kitchen, and they all shared the full bathroom on the second floor. Plaintiff testified that he took possession of the Rooming House's

---

(Mem. Op. at pgs. 17–18 n.14, Feb. 17, 2016 [ECF No. 55].) The following parties were Defendants under only the first claim: Lieutenant J.W. Smith, Officer N.M. Slover, Officer J.D. Dixon, Officer W.C. Shively, Officer W.R. Merrill, Officer M.C. Pace, and Officer R.C. Landrum. (Id. at pg. 17.) By way of amendment, Plaintiff added a sixth claim: "Officer L. D. Land compounded [the alleged constitutional violations at the Rooming House] by giving perjured testimony in the Circuit Court of Danville on January 24th, 2014." (Order at pg. 3, Apr. 8, 2016 [ECF No. 73] (quoting Amend Pl.'s Mot. for Leave to Add Joinder of Additional Pls. at pg. 2, Mar. 17, 2016 [ECF No. 62]).)

THESE SIX ARE THE ONLY CLAIMS BEFORE THE COURT. The parties expressed no disagreement with my understanding of the claims before the Court. To whatever extent Plaintiff disagreed with this understanding, he had ample opportunity to ask leave to amend his Complaint (which procedure he otherwise exercised). Had Defendants wanted, they had ample opportunity to file a motion for summary judgment or another motion to dismiss.

[2] I note that Plaintiff, inter alia, addressed discovery matters and called for criminal investigation of the underlying facts by the U.S. Attorney and "a [sic] independent special grand jury." (See Pl.'s Post-Trial Br. at pgs. 21–22, July 26, 2016 [ECF No. 150].) Neither the bench trial nor the post-trial briefing is the appropriate forum for these requests.

[3] Parties do well to focus their evidence on the claims and elements in issue. Evidence at trial delved into several matters *far* attenuated from the claims in issue. This Memorandum Opinion's omission of these matters reflects only their legal insignificance to my decision. These omissions should not be interpreted as my failure to have considered or observed any of the evidence.

whole first floor before 2000, that this was a single-family dwelling, and that the tenants were allowed the kitchen's use as a privilege. However, the trial evidence made clear that the first floor's common area and stairs—the only means of accessing the tenants' upstairs rooms—were shared.

At material times, Jeanette Staton was one of the Rooming House's tenants. She was a paid informant of the Danville Police Department, and she had proven herself reliable to Sergeant H.S. Richardson. On September 25, 2013, she informed Sergeant Richardson that Plaintiff was selling small amounts of marijuana from Room 1. Although the evidence at trial did not make clear what precise terms she used, it is clear that Staton also informed Sergeant Richardson of the Rooming House's internal arrangement. Accurately, mistakenly, or otherwise,[4] she informed Sergeant Richardson that it was an apartment building with apartments inside, including "Apartment 2" in which Plaintiff lived and "Apartment 1" used as his office.

With this information, Sergeant Richardson obtained a search warrant.[5] A magistrate issued the following search warrant:

> You are hereby commanded in the name of the Commonwealth to forthwith search either in day or night
>
> LOCATION/DESCRIPTION OF PLACE, PERSON, OR THING TO BE SEARCHED
>
> 505 Jefferson Street Danville Va. multiple unit dwelling and all persons present. As one travels South on Court Street from the City of Danville Municipal Building, turn right onto Loyal Street. Travel on Loyal Street until the road name changes to Jefferson Street. Once one travels through the intersection of Green Street, the dwelling to be searched is the second dwelling to the left. The dwelling is a two story structure with white vinyl siding. The numbers 505 are on the black mailbox that is affixed to the left on

---

[4] Whichever, it is immaterial to my decision on the claims before the Court.

[5] Sergeant Richardson also had some knowledge of Plaintiff's DVD-bootlegging operation, but this was not his primary focus when planning the initial search.

> the front door. The front door is centered with white columns on both sides. Once one enters the structure, the room to be searched will be the first to the left on the first floor with double doors to go through.
>
> LIST PROPERTY, OBJECTS, AND/OR PERSONS SOUGHT IN SEARCH
>
> Marijuana, scales, monies, baggies, digital media devices, documents, paraphernalia, and any instrumentalities associated with the illegal possession and/or distribution of marijuana.
>
> You are further commended [sic] to seize said property, persons, and/or objects if they be found and to Produce before the Danville Circuit Court an inventory of all property, persons, And/or objects seized.
>
> This search warrant is issued in relation to an offense substantially described as follows: Possession with Intent to Distribute Marijuana in violation of Virginia State Code 18.2-248.1.

(Pl.'s Ex. 3, at pg. 1.) In a briefing before executing the search, officers discussed the Rooming House as a rooming house. The officers understood the Rooming House's front door to be a common entryway to a common area, through which a person would access the individual rooms within the Rooming House.

Roughly single file, officers walked toward the Rooming House and up the front steps. Some number of them entered through the front door, without knocking or otherwise announcing their presence, and into the common area. Officers W.R. Merrill and L.D. Land were the first to enter the Rooming House. The door was unlocked. Entering into the common area and turning to Room 1's open door, Officer Merrill saw Brittany Logan sitting directly across from him, a few feet inside. As Officer Merrill entered the room, he hollered, "Police Department! Search Warrant!"[6] Once Logan was secured, officers began searching Room 1.

Among the items found in Room 1 were "an assorted box of small arms and rifle ammunition," four cell phones, two "plastic baggies containing marijuana," a marijuana grinder,

---

[6] Officer Merrill's announcement began when he was outside of the door, and it continued as he entered.

- 4 -
Case 4:15-cv-00037-JLK-RSB   Document 151   Filed 08/05/16   Page 4 of 14   Pageid#: 1994

and a "'BB' pistol." (Pl.'s Ex. 10, at pg. 1.) Officers also found marijuana in Logan's jacket. Officers also observed, in plain view, a substantial quantity of DVDs and digital-media devices, revealing a large-scale DVD-bootlegging operation.[7] After obtaining guidance from a special investigator, a second warrant was obtained, and searches and seizures followed in relation to the DVD bootlegging. (See generally Pl.'s Ex. 4.) Cataloguing and boxing the DVDs required many hours of work that night and the next day.

Shortly after the officers' entry into the Rooming House, Plaintiff and Michele Owens, a tenant, came from the kitchen, into the common area, so as to approach the officers. They expressed their concern and astonishment at the officers' entry. Plaintiff exclaimed that they had simply walked in, and an officer informed that they had a search warrant. Plaintiff asked to see the warrant, but one was not provided.[8]

Later, Officer J.D. Lancaster asked if Plaintiff would empty his pockets and hand over his phone. Unwilling to argue and apprehensive of the situation, Plaintiff complied without making any verbal response.[9] He handed over an HTC smart phone and $554 in cash. The cash was in two bundles, one in Plaintiff's pocket and one in his wallet. The bills were in denominations of $20 or less. Plaintiff was cooperative during this encounter. He also unlocked the phone for

---

[7] The operation's scale was significantly larger than Sergeant Richardson had generally understood. Cf. supra note 5.

[8] At some point, Sergeant Richardson informed Plaintiff that he would later receive a copy of the warrant. He also briefly took the warrant out of his pocket so as to show the piece of paper but not its terms. Plaintiff did not see a copy until after the officers left, and he saw no supporting affidavit until he purchased copies from the Clerk of the Danville Circuit Court.

[9] This finding required reconciling some of the evidence. With commendable candor, Officer Lancaster testified that he could not remember whether he or Plaintiff removed the items from Plaintiff's pockets. Owens (who was standing next to Plaintiff) testified that Officer Lancaster asked Plaintiff for the phone and his pockets' contents and that Plaintiff handed them over without verbal response. Plaintiff gave conclusory testimony, without enhancement, that Officer Lancaster seized the money and cell phone. Plaintiff's testimony was not illuminating, but Owens' version confirmed that Officer Lancaster asked for the items and that Plaintiff handed them over.

Officer Lancaster, who found inside "multiple text messages showing [Plaintiff] contacting different individuals about what movies he had available and what movies individuals wanted from [him]." (Pl.'s Ex. 9, at pg. 1.)

In total, officers seized the following items under the initial search warrant:

1. [$]554[.]$^{00}$ currency
2. Digital scales
3. Plastic bag containing another plastic bag of green plant material
4. Bag of green plant material
5. Metal grinder
6. Assorted caliber ammunition
7. .177 BB handgun
8. HTC smart phone
9. Motorola smart phone
10. Sanyo flip phone
11. Kyocera cell phone
12. Samsung cell phone.

(Pl.'s Ex. 1, at pg. 2.) Relative to the DVD bootlegging, officers seized various items under the second warrant. (See generally Pl.'s Ex. 4, at pg. 2.)

In relation to marijuana, Plaintiff was never charged in Danville Circuit Court.[10] As to the DVD bootlegging, Plaintiff was convicted of a felony (Va. Code Ann. § 59.1-41.3) and a misdemeanor (id. § 59.1-41.4). The Court of Appeals of Virginia denied Plaintiff's petition for a writ of appeal, and his convictions are pending consideration by the Supreme Court of Virginia.

## II. DISCUSSION

"[C]ivil rights plaintiffs under 42 U.S.C. § 1983 bear the burden of proving each element of their case by a preponderance of the evidence." Hemphill v. Farrand, No. C/A 9:99-0815-13RB, 2001 WL 34681743, at *5 (D.S.C. June 14, 2001), aff'd, 22 F. App'x 273 (4th Cir. 2001). I address the facts to the law of Plaintiff's six claims, in turn.

---

[10] Trial evidence got across the gist of this paragraph, which was supplemented with permissible judicial notice of the proceedings in state court. See Fed. R. Evid. 201.

A. The Fourth Amendment (as Incorporated by the Fourteenth)

"The maxim that 'every man's house is his castle' is made a part of our constitutional law in the clause prohibiting unreasonable searches and seizures; and in the protection it affords, it is worthy of all the encomiums which have been bestowed upon it." Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union 299–300 (1868) (quoting Herbert Broom, A Selection of Legal Maxims 321 (6th Am. ed. 1868)). This clause reads,

> The right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV (emphasis added).

> By its plain text, the Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable. The test of reasonableness under the Fourth Amendment is an objective one. . . . [I]n order to satisfy the reasonableness requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government . . . is not that they always be correct, but that they always be reasonable.

McDaniel v. Arnold, 898 F. Supp. 2d 809, 833 (D. Md. 2012) (citations and internal quotation marks omitted).

> [T]he question is whether the officer's actions are "objectively reasonable" in light of the facts and circumstances confronting him, without regard to his own subjective intent or motivation. Subjectively bad intentions on the part of the individual officer will not make a constitutional violation out of an otherwise reasonable [search or] seizure; nor will subjectively good intentions render an objectively unreasonable [search or] seizure constitutional.

See Martin v. Gentile, 849 F.2d 863, 869 (4th Cir. 1988) (citations omitted).

1. Knock and Announce

"The general touchstone of reasonableness which governs the Fourth Amendment analysis governs the method of execution of the warrant," United States v. Ramirez, 523 U.S. 65, 71 (1998) (quoting Pennsylvania v. Mimms, 434 U.S. 106, 108–109 (1977) (per curiam)), and there are "some circumstances" where "an officer's unannounced entry into a home might be unreasonable under the Fourth Amendment," Wilson v. Arkansas, 514 U.S. 927, 934 (1995). The general rule is as follows: "Before forcibly entering a residence, police officers 'must knock on the door and announce their identity and purpose.'" Bellotte v. Edwards, 629 F.3d 415, 419 (4th Cir. 2011) (quoting Richards v. Wisconsin, 520 U.S. 385, 387 (1997)). "This is not to say, of course, that every entry must be preceded by an announcement." Wilson, 514 U.S. at 934. For example, an officer need not notice his entry through an open door, i.e., he need not notice an entry that is "peaceable and with no forcible breaking." See United States v. Marson, 408 F.2d 644, 646 (4th Cir. 1968);[11] accord Wingrove v. Forshey, 230 F. Supp. 2d 808, 819 (S.D. Ohio 2002) ("[A] number of circuit courts have concluded that entry through an open door does not implicate the Fourth Amendment's knock and announce requirement."); United States v. Remigio, 767 F.2d 730, 732 (10th Cir. 1985) (collecting cases).

---

[11] Although the Fourth Circuit decided this aspect of Marson under 18 U.S.C. § 3109, see 408 F.2d at 646–47, "this statute 'encompasses the constitutional requirements of the fourth amendment,'" United States v. Kennedy, 32 F.3d 876, 882 (4th Cir. 1994) (quoting United States v. Singer, 943 F.2d 758, 761 (7th Cir. 1991)); see also Johnson v. City of Aiken, No. 98-2611, 2000 WL 263823, at *6 n.7 (4th Cir. Mar. 9, 2000). Along these lines, Judge Cleland of the U.S. District Court for the Eastern District of Michigan persuasively reasoned,

> The prevailing view in most federal circuits is that entry through open doors by law enforcement agents executing a search warrant does not implicate the "knock and announce" statute. By extension, if the statutory requirement of knocking and announcing is not implicated by an entry through an open door, the Fourth Amendment's reasonableness requirement would not be offended by doing so.

United States v. Williams, No. 05-80403, 2005 WL 2127597, at *9 (E.D. Mich. Aug. 31, 2005) (citations omitted), aff'd, 544 F.3d 683 (6th Cir. 2008).

- 8 -

The requirement can apply to different places in different ways. For example, "when the police intend to execute a warrant describing a particular apartment in an apartment building or a particular room in a rooming house, the notice must be given before entry of the door leading into the described premises even though that door is literally an 'inner door.'" See 2 Wayne R. LaFave, Search and Seizure § 4.8(c) (5th ed. 2012) (footnotes omitted). As for the outer door, a notice requirement "is in *considerable tension* with the principle that tenants lack a legitimate expectation of privacy in the common areas of multi-family buildings." Id. (emphasis added) (quoting United States v. Espinoza, 256 F.3d 718, 723 (7th Cir. 2001)). (See generally Mem. Op. at pgs. 10–11, Feb. 17, 2016 [ECF No. 55] (discussing Fourth-Amendment standing).)[12]

Officers Merrill and Land entered an unlocked door into a common area, which they correctly understood it to be. Even if the officers were mistaken about the general public's right of access, they *reasonably* understood the common area to be one through which a member of the general public would reach a tenant's room. Cf. Florida v. Jardines, 133 S. Ct. 1409, 1416 (2013). It had sufficient, objective indicia—an unlocked door leading to an open area, the only means by which one could access a tenant's room—and Staton had let on as much to Sergeant Richardson, who planned and briefed the entry. Even if they were mistaken about the general permission to be in the common area, they were *reasonably* mistaken. They reasonably withheld notice when entering the common area.

As for the "inner door" to Room 1, when Officer Merrill reached the open door, from which Logan could see him, he announced, "Police Department! Search Warrant!" His entry

---

[12] The facts do not require me to reconcile the different approaches, so I merely note the divided authority over one's reasonable expectation of privacy, as a general matter, in the common area of a rooming house or apartment building. See generally 1 LaFave, supra, at § 2.3(b) (surveying pertinent precedent); State v. Talley, 307 S.W.3d 723, 731–32 (Tenn. 2010) (same). Cf. Johnson v. Ambling Mgmt. Co., No. CIVA 8:07-CV-1614HFF, 2008 WL 4372909, at *3 (D.S.C. Sept. 17, 2008) (Floyd, J.) (concluding that "there can be no expectation of privacy when in a common area of an apartment complex" after synthesizing pertinent federal precedent in applying a comparable state-law requirement).

- 9 -

through the open door being peaceable and requiring no breaking, Plaintiff's knock-and-announce claim fails.

   2. Improper Service of Warrants or Affidavits[13]

> The Fourth Amendment does not require an officer to serve a search warrant before executing it. In fact, the Fourth Amendment is not offended where the executing officer fails to leave a copy of the search warrant with the property owner following the search, or fails even to carry the warrant during the search.

United States v. Hurwitz, 459 F.3d 463, 472 (4th Cir. 2006); see also United States v. Montieth, 662 F.3d 660, 670 (4th Cir. 2011). Nor, for that matter, is there "a constitutional mandate that an executing officer possess or exhibit the affidavit or any other document incorporated into the warrant at the time of the search *in order for the warrant to be valid*." Hurwitz, 459 F.3d at 472. There is no legal significance to Plaintiff's qualm with the means or accomplishment of any warrants' or affidavits' service.

   3. Search of Person and Seizure of Cash and Cell Phone

"Although the Fourth Amendment generally prohibits warrantless searches,[14] valid consent to seize and search items provides an exception to the usual warrant requirement." United States v. Buckner, 473 F.3d 551, 553–54 (4th Cir. 2007) (citing Maryland v. Dyson, 527 U.S. 465, 466 (1999)). "The Fourth Amendment test for a valid consent . . . is that the consent be voluntary." Ohio v. Robinette, 519 U.S. 33, 40 (1996).

---

[13] There is no claim before the Court questioning probable cause for either warrant's issuance. Nor is there a claim attacking the initial warrant as a general or all-persons warrant violating particular-description or probable-cause requirements. Cf. Owens ex rel. Owens v. Lott, 372 F.3d 267, 276 (4th Cir. 2004); United States v. Hicks, 395 F. App'x 80, 81 (4th Cir. 2010).

[14] Given the completeness of the reasoning for decision on this claim, I need not, and do not, take any view whether the warrant authorized the alleged search of Plaintiff or the alleged seizure of his cash and cell phone.

> In assessing voluntariness of the consent, [courts] examine the totality of the circumstances including factors such as the characteristics of the accused, his education and intelligence, the number of officers present,[15] along with the location and duration of the [encounter]. Whether the person giving consent knew that he possessed a right to refuse consent also is relevant in determining the voluntariness of consent.

United States v. Digiovanni, 650 F.3d 498, 514 (4th Cir. 2011) (quoting United States v. Buckner, 473 F.3d 551, 554 (4th Cir. 2007)), as amended (Aug. 2, 2011).

A reasonable officer would have interpreted Plaintiff's emptying his pockets' contents and providing the cell phone and cash—the sort of items associated with the drug trade and sought in connection with the search—as consensual or voluntary, not rendered under coercive forces. Given Plaintiff's concern in approaching the officers to inquire about their entry and the warrant, a reasonable officer would have concluded that Plaintiff appreciated that he did not *have to* consent to a search of his person or a seizure of items from his person. Plaintiff cooperated, going so far as to even unlock his cell phone for Officer Lancaster.[16] Although there were roughly ten officers inside and guns were drawn, there is no evidence that officers ever pointed their weapons at Plaintiff, informed that he was under arrest, physically subdued him, handcuffed him, or even patted him down.[17] Officer Lancaster reasonably understood Plaintiff to voluntarily comply with his request,[18] and he lawfully obtained the cash and cell phone.

---

[15] "[T]he mere presence of some police officers in a confined space does not necessarily exert coercion of a constitutionally-defective nature." United States v. Zamoran-Coronel, 231 F.3d 466, 469 (8th Cir. 2000); see, e.g., United States v. Peterson, 524 F.2d 167, 178 (4th Cir. 1975).

[16] To be clear, Plaintiff's claim is for the physical seizure of the cell phone—not for any rummaging through his cell phone's data. Cf. Riley v. California, 134 S. Ct. 2473 (2014).

[17] Location also cuts against coercion. The encounter with Officer Lancaster occurred in the Rooming House, where Plaintiff was the landlord and a resident. They were in the common area, and Owens—also expressing concern about the officers' entry—stood by Plaintiff.

[18] Even if Plaintiff believed he was under arrest, his subjective interpretation is not dispositive. See United States v. Hashime, 734 F.3d 278, 285 (4th Cir. 2013). The proper inquiry is into *Officer Lancaster's*

- 11 -
Case 4:15-cv-00037-JLK-RSB Document 151 Filed 08/05/16 Page 11 of 14 Pageid#: 2001

4. <u>Seizure of Ammunition, Dies, and a Gun</u>

A "warrant limits the intrusion on privacy by specifying the scope of the search—that is, the area that can be searched and the items that can be sought." <u>Birchfield v. North Dakota</u>, 136 S. Ct. 2160, 2181 (2016); <u>see</u> <u>United States v. Phillips</u>, 588 F.3d 218, 223 (4th Cir. 2009). "But the terms of the warrant are not to be interpreted in a 'hypertechnical' manner. Rather, they should be read with a 'commonsense and realistic' approach, to avoid turning a search warrant into a 'constitutional straight jacket.'" <u>United States v. Williams</u>, 592 F.3d 511, 519 (4th Cir. 2010) (quoting <u>United States v. Robinson</u>, 275 F.3d 371, 380 (4th Cir. 2001), and in turn, <u>United States v. Phillips</u>, 588 F.3d 218, 223 (4th Cir. 2009)). Overall, the analysis of a search warrant's execution requires that a court "conduct an 'objective assessment of the [executing] officer's actions in light of the facts and circumstances confronting him at the time.'" <u>Id.</u> at 287 (alteration in original) (quoting <u>Maryland v. Macon</u>, 472 U.S. 463, 470–71 (1985)).

The initial warrant authorized seizure of "any instrumentalities associated with the illegal possession and/or distribution of marijuana." (Pl.'s Ex. 1, at pg. 1.) "It is well established that firearms may be considered items used in connection with controlled substances," <u>United States v. Calisto</u>, 838 F.2d 711, 716 (3d Cir. 1988), as, by close (if not necessary) association with firearm use, are the ammunition and dies. The officers reasonably construed the warrant to include the box of ammunition, dies, and BB gun, and they reasonably executed the warrant in seizing those items.

---

reasonableness in light of observable facts and circumstances. <u>See</u> <u>Florida v. Jimeno</u>, 500 U.S. 248, 250–51 (1991).

5. Inventory of DVDs Without Warrant

The evidence did not carry Plaintiff's burden of proving that officers inventoried the DVDs before obtaining the second warrant; rather, the evidence more reasonably showed that the inventory occurred under warrant. This claim fails.

B. The Fourteenth Amendment[19]

"No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Fourteenth Amendment's Due Process Clause seems to be the asserted basis for Plaintiff's perjury claim. Cf., e.g., Surine v. State Police Emergency Response Team, No. 4:08-CV-1921, 2012 WL 162463, at *5 (M.D. Pa. Jan. 19, 2012) (construing the plaintiff's "perjury" allegation "as a Fourteenth Amendment deprivation of due process claim" and addressing it to the dictionary definition).[20] "[P]erjury is '[t]he act or an instance of a person's deliberately making material false or misleading statements while under oath,'" Bryant v. Washington Mut. Corp., No. CIV. 6:07CV00015, 2007 WL 4390386, at *5 (W.D. Va. Nov. 19, 2007) (quoting Black's Law Dictionary (8th ed. 2004)), "esp[ecially], the willful utterance of untruthful testimony under oath or affirmation, before a competent tribunal, on a point material to the adjudication," *Perjury*, Black's Law Dictionary (10th ed. 2014).[21]

---

[19] There is no claim before the Court for failure to disclose exculpatory evidence in connection with Plaintiff's criminal proceedings in state court.

[20] Defendants have not argued otherwise, and I assume without deciding that such a claim exists in the abstract.

[21] Defendants' counsel did not invoke the immunity, but I note that, "[i]n Briscoe v. LaHue, the Supreme Court held that government officials who testify at criminal trials are absolutely immune from damages liability based on their testimony." Lyles v. Sparks, 79 F.3d 372, 378 (4th Cir. 1996) (citing 460 U.S. 325, 326 (1983)). "Indeed, under Briscoe v. LaHue, a witness is immunized from liability for his testimony *even if the testimony is perjured*." Lee v. Queen Anne's Cnty. Office of Sheriff, No. CIV.A. RDB-13-672, 2014 WL 476233, at *7 (D. Md. Feb. 5, 2014) (emphasis added) (citing 460 U.S. at 342–43). See generally Briscoe, 460 U.S. at 341–45 (rejecting argument that the Court "carve out an exception to the general rule of immunity in cases of alleged perjury by police officer witnesses").

There was no trial evidence to marshal the facts of Officer Land's testimony in Danville Circuit Court to the elements of perjury. Not only did Plaintiff not prove this claim, he also failed to offer any evidence supporting it.

### III. CONCLUSION

"When constabulary duty's to be done . . . , [t]he policeman's lot is not a happy one . . . [.]" W.S. Gilbert & Arthur Sullivan, The Pirates of Penzance 33 (1879). Defendants might find some reprieve in the denial of their liability under the law and evidence in issue. As to Plaintiff, a trial must have a winner and a loser. Who is who depends on law and evidence. It is hoped that, at the day's end, Plaintiff has satisfaction in the fair hearing of his case. Judgment will be entered for Defendants.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to Plaintiff and all counsel of record.

Entered this 5th day of August, 2016.

s/Jackson L. Kiser<br>
SENIOR UNITED STATES DISTRICT JUDGE